# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DIANA GOODSELL, et al.,

    Plaintiffs

v.

TEACHERS HEALTH TRUST, et al.,

    Defendants

Case No.: 2:23-cv-01510-APG-DJA

**Order (1) Granting in Part Motions to Certify and Decertify, (2) Granting the Defendants' Motion for Summary Judgment, (3) Denying as Moot the Motion to Strike, and (4) Granting in Part the Motion for Spoliation Sanctions**

[ECF Nos. 104, 106, 107, 108, 109]

    The plaintiffs are Clark County School District (CCSD) teachers and others who were enrolled in defendant Teachers Health Trust's (THT) plan for health benefits coverage. The named plaintiffs sued various entities and individuals on behalf of themselves and others similarly situated, alleging that THT has been mismanaged, either negligently or intentionally, to their detriment. Prior to the case being removed to this court, the state court certified a class action. According to the second amended complaint, the certified class "consists of CCSD employees considered as an Eligible Employee for enrollment in the THT health plans since May 11, 2012, including (1) licensed employees of CCSD, paid on the teachers' salary schedule, and eligible for representation by the CCEA (and their dependents); (2) licensed employees of participating CCSD charter schools who are acting in the capacity of a teacher (and their dependents); and (3) employees of the CCEA or the Teachers Health Trust (and their dependents)," with subclass periods of 2012-2015, 2016-2018, and 2019-2021. ECF No. 1-2 at 4-5, 9, 13, 18.

/ / / /

/ / / /

1    The plaintiffs and THT agree that the only remaining claim in this case against a non-

2    defaulted defendant[1] is the plaintiffs' breach of contract claim against THT. *See* ECF Nos. 108 at

3    15 n.3 (stating the parties agreed only the breach of contract and breach of fiduciary duty claims

4    remain); 114 at 4 (stating that THT is the only remaining active defendant and that the breach of

5    fiduciary duty claim is "subsumed by" the breach of contract claim).[2]    The plaintiffs' expert

6    proposes to calculate class-wide damages related to alleged breaches for:

7        (1) THT's failure to pay claims on time,

8        (2) the reduction in THT's in-network benefits,

9        (3) THT's cost-sharing with members in the form of:

10            (a) excessive premiums,

11            (b) excessive deductibles,

12            (c) excessive co-payments and co-insurance for in-network medical care, and

13            (d) excessive out-of-pocket expenses for in-network medical care, also referred to

14        as the out-of-pocket maximum.

15    ECF Nos. 104-3 at 6, 38; 108 at 5 (THT's brief identifying the types of damages the plaintiffs are

16    claiming).  Her calculations relate to two types of alleged contractual breaches: (1) a failure to

17    timely pay claims and (2) changes to plan terms or benefits, which would include her calculated

18    damages for the reduction of in-network benefits and the various cost-sharing mechanisms.

19

20    _____

21    [1] The clerk has entered default against Medsource Management Group, LLC and Value Based
Healthcare Institute, LLC. ECF Nos. 70; 76.

22    [2] Because the plaintiffs collapse their fiduciary duty claim into their contract claim, I do not
address the claims separately, and thus I do not address THT's arguments that were directed at

23    only the breach of fiduciary duty claim. *See* ECF No. 108 at 22-26 (arguing THT does not owe
the plaintiffs a fiduciary duty and that any breach of a fiduciary duty would inure to the trust
fund's benefit rather than an individual plan participant's benefit).

THT moves for summary judgment on five grounds: (1) the named plaintiffs failed to administratively exhaust the plan's appeal process; (2) the plaintiffs cannot show they suffered harm from any breach; (3) the plan allowed for changes to plan benefits; (4) THT is not responsible for changes to premiums and benefits that are the result of collective bargaining between CCSD and the union; and (5) the plaintiffs failed to join indispensable parties.  The plaintiffs oppose on each ground.

The parties are familiar with the facts, so I repeat them here only as necessary to resolve the motions.  I grant in part the plaintiffs' motion to amend the certified class and grant in part THT's motion to decertify the class.  I grant THT's motion for summary judgment except for named plaintiff Annette Anas's claim related to a 2015 hospital bill.  I deny as moot THT's motion to strike the plaintiffs' expert.  I grant in part the plaintiffs' motion for spoliation sanctions.

## I.  LEGAL STANDARD

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th

1  Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a

2  genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and

3  reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of*

4  *Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

5  **II.  LEGAL STANDARDS FOR BREACH OF CONTRACT**

6          CCSD and the Clark County Education Association (CCEA) entered into a collective

7  bargaining agreement (CBA), which governs the parties' rights and obligations regarding

8  insurance benefits through THT. ECF No. 8-1 at 50-55.  THT's trust formation agreement

9  provides that THT was meant to "conform to" ERISA's requirements "even though [ERISA]

10 does not now[3] apply to public employee benefit plans." ECF No. 8-3 at 7.  ERISA does not

11 apply to benefit plans for government employees. 29 U.S.C. §§ 1002(32), 1003(b)(1).

12 Consequently, while ERISA does not apply by its own force to the THT plan, because the trust

13 agreement expresses an intent to comply with ERISA I must interpret the agreement considering

14 that contractually expressed intent.

15          The trust formation agreement provides that it is governed by applicable federal law and

16 Nevada law to the extent that state law is not preempted by federal law. ECF No. 8-3 at 22.

17 Because ERISA does not apply to the THT plan, federal law has no preemptive force, so I apply

18 Nevada law to the breach of contract claim. *See* ECF No. 108-15 at 12, 18-19, 48-49, 68-69, 85-

19 86, 115, 124, 142, 154, 189, 205, 219 (THT plan documents stating Nevada law governs the plan

20 during the relevant plan years).

21          Under Nevada law, to "prevail on a claim for breach of contract, the plaintiff must

22 establish (1) the existence of a valid contract, (2) that the plaintiff performed, (3) that the

23

---

[3] "Now" meaning when the trust was formed in 1983. ECF No. 8-3 at 7.

defendant breached, and (4) that the breach caused the plaintiff damages." *Iliescu, Tr. of John Iliescu, Jr. & Sonnia Iliescu 1992 Fam. Tr. v. Reg'l Transportation Comm'n of Washoe Cnty.*, 522 P.3d 453, 458 (Nev. Ct. App. 2022). "Relating to damages, a plaintiff must prove both (1) a causal connection between the defendant's breach and the damages asserted, and (2) the amount of those damages." *Id.*

To the extent I must interpret the contract to determine whether there was a breach, "[c]ontract interpretation is a question of law and, as long as no facts are in dispute," I look to the agreement's language "and the surrounding circumstances" to discern the contracting parties' intent. *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106  (Nev. 2015) (en banc) (quotation omitted).  I apply "[t]raditional rules of contract interpretation . . . to accomplish that result." *Id.* (quotation omitted).  I begin by determining whether the contract's language is "clear and unambiguous; if it is, the contract will be enforced as written." *Id.* (quotation omitted).  "A contract is ambiguous when it is subject to more than one reasonable interpretation." *Anvui, LLC v. G.L. Dragon, LLC*, 163 P.3d 405, 407 (Nev. 2007).  But the mere fact that the parties disagree about how to interpret the contract does not render it ambiguous. *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013).  "Rather, an ambiguous contract is an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning." *Id.* (quotations omitted).

## III.  MOTIONS TO CERTIFY AND DECERTIFY THE CLASS

The plaintiffs move to amend the certified class to add all CCSD retirees enrolled in the THT plan since November 1, 2014; to add plaintiff Paula Kevish as the named representative for the retiree class; and to certify damages subclasses for the periods of 2012-2015, 2016-2018,

2019-2021, and 2021-2024.  The defendants oppose expansion of the class definition and move to decertify the class that the state court certified.

To obtain certification of a class to pursue money damages, the plaintiffs must satisfy Federal Rule of Civil Procedure 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation, as well as Rule 23(b)(3)'s requirements of predominance and superiority.  The plaintiffs bear the burden of proving Rule 23's prerequisites "by a preponderance of the evidence," even where the defendant moves to decertify.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc); *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd and remanded on other grounds*, 586 U.S. 188 (2019); *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Rather, the "party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis omitted). I must perform "a rigorous analysis" to ensure Rule 23's requirements have been satisfied. *Id.* at 350-51.  Thus, the "determination whether expert evidence is capable of resolving a class-wide question in one stroke may include weighing conflicting expert testimony and resolving expert disputes where necessary to ensure that Rule 23(b)(3)'s requirements are met and the common, aggregation-enabling issue predominates over individual issues." *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 666 (simplified).  And the Rule 23 analysis may "overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351.  However, I should consider merits questions only to the extent that they are relevant to determining whether the plaintiffs have

6

satisfied Rule 23's requirements. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The inquiry is not whether the class will prevail on the merits of their claims but whether common questions capable of class-wide resolution exist and whether those common questions predominate over individualized ones. *Id.* at 469.

Here, the parties do not dispute numerosity. But they dispute the remaining Rule 23(a) and (b)(3) requirements. As discussed below, I deny the motion to certify a class for the period of 2021-2024. I deny the motion to decertify the class related to alleged breach of contract based on THT changing plan terms and I grant the motion to amend the class for this claim to include the retirees. Finally, I grant the motion to decertify the class related to the alleged breach of contract based on late payments.

**A. I deny the motion to certify any class for the period of 2021-2024 because there are no allegations to support that period in the second amended complaint.**

The plaintiffs move to amend the certified class to add various subclasses for certain time periods, including a new subclass for the period of 2021-2024. *See* ECF No. 104 at 2, 9. However, the second amended complaint, which was filed in July 2023, ended its allegations in 2021. *See* ECF No. 1-2 at 18-19. Additionally, the facts the plaintiffs cite in their motion to certify do not support a breach during the newly proposed time. The plaintiffs assert that in July 2021, THT installed a new CEO who testified that when he took over, THT owed approximately $61 million to medical providers. ECF No. 104 at 9. The new CEO also recognized there previously had been poor management, and he "was able to cut approximately $10 million in unnecessary administrative costs from the annual expenses quickly, without further compromising" THT's operations. *Id.* It is unclear from these assertions how anyone in the

2021-2024 class suffered an injury from a breach of contract.  I therefore deny this aspect of the plaintiffs' motion to certify.

**B.  I deny decertification for the alleged breach regarding changes to plan terms, and I grant the motion to amend certification to add retirees for this alleged breach.**

Because the parties do not dispute numerosity, I address whether the plaintiffs have met their burden to show commonality, predominance, superiority, typicality, and adequacy. Commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 349-50 (quotation omitted).  The class's claims "must depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.  In contrast, an individual question is one where members of the class must "present evidence that varies from member to member. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation omitted).  The question is whether the plaintiffs' claim is capable of being resolved, either successfully or unsuccessfully, through common proof. *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1026 (9th Cir. 2024) (stating that "when the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification" (simplified)).

In addition to proving commonality under Rule 23(a), the plaintiffs must also show predominance and superiority under Rule 23(b)(3).  To meet these requirements, the plaintiffs must show (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 26(b)(3). Predominance is related to commonality because it "presupposes satisfaction of the commonality requirement of [Rule] 23(a)(2), which itself tests the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Lytle*, 114 F.4th at 1023 (simplified). "But the predominance inquiry goes further and asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quotation omitted). "Predominance is not, however, a matter of nose-counting. Rather, more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (quotation omitted). Consequently, "even if just one common question predominates, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." *Id.* (quotation omitted).

I "have a duty to take a close look at whether common questions predominate over individual ones to ensure that individual questions do not overwhelm questions common to the class." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 927 (9th Cir. 2019) (quotation omitted). With respect to the predominance inquiry specifically, I must evaluate "the method or methods by which plaintiffs propose to use the class-wide evidence to prove the common question in one stroke." *Olean*, 31 F.4th at 666 (simplified). For the plaintiffs to meet their burden to prove that a common question predominates, "they must show that the common question relates to a central issue" in their claim. *Id.* at 665. As a result, I begin with the

1  elements of the underlying cause of action, breach of contract. *Erica P. John Fund, Inc. v.*

2  *Halliburton Co.*, 563 U.S. 804, 809 (2011).

3         The plaintiffs' claim that THT breached the contract by changing plan terms, provider

4  networks, and cost-sharing mechanisms is a question that can be resolved on a class-wide basis

5  using common proof and is central to this aspect of the plaintiffs' breach of contract claim.  If

6  charging higher premiums or setting higher deductibles constitutes a breach of the contract as the

7  plaintiffs contend, that would have affected all plan members.  Conversely, if the contract

8  allowed THT to change its plan terms, as THT argues, then it did not breach as to any class

9  member.  That this aspect of the plaintiffs' claim can be resolved in one stroke is shown by the

10 parties' arguments on summary judgment, as they argue in blanket fashion whether THT is

11 entitled to make changes to the plan and whether it is responsible for some changes, like the

12 premium amounts.

13        Determining the question of whether THT breached the contract in these ways on a class-

14 wide basis is superior to individualized claims because there is nothing individualized about the

15 question of whether THT breached, so a class action is "the most efficient and effective means of

16 resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th

17 Cir. 2010) (quotation omitted).  Either THT can make the changes as to all plan participants or is

18 not responsible for some changes, as it argues, or it cannot and is responsible, as the plaintiffs

19 argue.  For these same reasons, the named plaintiffs' claims are typical of the class. *A. B. v.*

20 *Hawaii State Dep't of Educ.*, 30 F.4th 828, 839 (9th Cir. 2022) (stating that to meet Rule

21 23(a)(3)'s typicality requirement, the plaintiffs must show that other class members "have the

22 same or similar injury, whether the action is based on conduct which is not unique to the named

23

1   plaintiffs, and whether other class members have been injured by the same course of conduct"

2   (simplified)).

3        Finally, the named plaintiffs are adequate for this aspect of the plaintiffs' breach of

4   contract claim.  "Adequate representation depends on the qualifications of counsel for the

5   representatives, an absence of antagonism, a sharing of interests between representatives and

6   absentees, and the unlikelihood that the suit is collusive." *Molski v. Gleich*, 318 F.3d 937, 955

7   (9th Cir. 2003), *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571

8   (9th Cir. 2010) (quotation omitted).  Adequacy looks to "uncover conflicts of interest between

9   named parties and the class they seek to represent." *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir.

10  2023) (quotation omitted).  Resolving the question of adequacy "requires that two questions be

11  addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other

12  class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously

13  on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000), *as*

14  *amended* (June 19, 2000).  "Only conflicts that are fundamental to the suit and that go to the

15  heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement."

16  *Kim*, 87 F.4th 994, 1000 (9th Cir. 2023).

17       THT does not dispute counsels' qualifications.  THT does not contend that counsel has a

18  conflict with the class or that this case has not been vigorously prosecuted on the class's behalf

19  up to this point.  Rather, THT argues that each named plaintiff has individualized complaints, is

20  detached from the litigation, or has otherwise indicated they are not invested in acting on the

21  class's behalf.

22       Although THT notes some individualized situations related to the named plaintiffs, each

23  of the named representatives would have been subjected to the same changes in the plan terms if,

as they allege, those changes constitute a breach. They also identified common complaints, such as raised premiums. *See* ECF No. 109-16 at 21; 109-18 at 5. THT identifies stray comments in the named plaintiffs' depositions that suggest they were uniformed or disengaged from the case, but the plaintiffs discussed the contours of what they believed THT did wrong in layman's terms and expressed an interest in seeking class recovery. *See* ECF Nos. 109-16 at 8, 12; 109-17 at 39; 109-18 at 26, 32; 109-19 at 6-9; 119-4 at 31-32. Additionally, each of the named plaintiffs has signed a declaration stating they are familiar with the allegations in this case, appeared for a deposition, and responded to discovery, so they have participated in the litigation. ECF Nos. 104-4 at 3; 104-6 at 3; 104-7 at 3; 104-8 at 3; 104-9 at 3. Each has stated they understand the class action is not only for themselves but for the class and they will continue to participate in prosecuting the action. ECF Nos. 104-4 at 3-4; 104-6 at 3; 104-7 at 3; 104-8 at 3; 104-9 at 3. THT has not identified any actual conflict between the named class representatives and the class. *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (stating typicality is a "permissive" standard). I therefore deny the defendants' motion to decertify the class for the portion of the breach of contract claim related to changes in THT's plan terms.

Additionally, I grant the plaintiffs' motion to amend the certified class to (1) include all enrolled CCSD retirees since November 1, 2014, when the Retirees Health Trust merged into THT, and (2) name plaintiff Paula Kevish as the class representative for this class. The retirees would have the same contractual claim based on the same facts with the class period commencing on November 1, 2014. Kevish is already a named class representative who may also serve as a named representative for the retiree class for the reasons already stated.

**C.  I grant THT's motion to decertify the class for the allegation that THT breached the contract by not paying claims on a timely basis because the plaintiffs have not met their burden to show commonality and predominance.**

THT moves to decertify the class, arguing that the class includes individuals who were not harmed even by the plaintiffs' own metrics, and there is no class-wide basis to determine injury and damages, as each plan participant's experience is individualized.  THT notes that the plaintiffs' own expert agrees that only 34% of the class had late payments under the plaintiffs' theory of liability, meaning 66% of the class suffered no injury from the alleged late payments. Additionally, THT asserts that there are many reasons why a claim may have been paid beyond 60 days that do not amount to a breach by THT, such as when the delay was due to incomplete paperwork or coordination between insurers when there was overlapping insurance policies, so determining whether a payment beyond 60 days was late due to THT's conduct is an individualized inquiry.  THT also contends that whether the participant paid the claim instead, when and how plan participants paid, and their damages are individualized inquiries that cannot be solved through the plaintiffs' expert report.  THT thus contends there is no commonality, typicality, or predominance.  THT also again argues that the named representatives are not adequate class representatives for various reasons, including that they did not suffer an injury, their claims are atypical, or they are disengaged from the case.

The plaintiffs respond that the state court's decision to grant certification should stand because the grounds supporting that decision remain.  They contend that common facts about the correct interpretation of the plan and whether THT breached it remain, and any concern about different plan language over time is resolved through subclasses for various time periods.  The plaintiffs assert the named plaintiffs' claims are typical of the class because they are members of

the respective subclass periods, and their expert used the THT claims data to show the costs each named plaintiff suffered due to THT's failure to timely pay claims.  They also assert that common issues about THT's conduct predominate, and individualized information is contained in THT's claims data that can be determined through their expert's damages model.  They contend that the need for individualized damages calculations does not defeat class certification.

The plaintiffs allege that THT breached the contract by failing to pay valid claims within 30 days. ECF No. 1-2 at 24.  The plaintiffs do not point to plan provisions that required payment within 30 days for any plan year. ECF Nos. 104 at 5; 114 at 6.  Rather, they point to an example of THT's agreements with medical providers (not with the plaintiffs) that required payment of so-called "clean" claims within 30 days. ECF No. 104-19 at 2, 13.  A clean claim means a claim that included all required information and was submitted on the proper forms. *Id.* at 2.  The plan consistently provided throughout the class period that a participant could not sue to recover from THT "prior to the expiration of 60 days after a claim has been furnished in accordance with [the plan's] requirements." ECF Nos. 104-15 at 264; *see, e.g.*, ECF No. 108-15 at 19, 48, 68, 115, 124, 142.  Thus, the plaintiffs contend that THT breached the contract by regularly failing to pay in-network claims within 30 days and out-of-network claims within 60 days, resulting in members having to bear costs themselves if they paid the provider or the provider sent them to collections for the unpaid bills.

The plaintiffs have not met their burden to show that determining whether THT breached the contract by not timely paying claims is capable of resolution on a class-wide basis.  The plaintiffs rely on their expert, Candice Rosevear, to attempt to make this showing.  But Rosevear's report does not and cannot show that THT breached the contract every time it took

more than 30 days after the claim was filed to pay in-network providers or more than 60 days to pay out-of-network providers.

Rosevear does not state that she reviewed THT's claims data to determine when each claim was complete under the plan. There may be reasons other than a breach by THT to explain why a claim was not paid within 30 or 60 days, such as coordination of benefits with another insurance provider, third party liability and subrogation issues, or the need for additional documentation. *See, e.g.*, ECF No. 108-15 at 4-8, 37-42, 72-82, 117-21, 144-48. The plaintiffs assert that Rosevear accounted for these possibilities because she evaluated only "Clean" claims. ECF Nos. 112 at 15 (citing ECF No. 112-2, Rosevear Reply Report); 115 at 24 (citing ECF No. 104-3, Rosevear's supplemental report); 122 at 12 (citing ECF No. 104-3, Rosevear's supplemental report). But the plaintiffs do not point to where in her report she states she considered only clean claims. Generally citing to her entire report does not suffice. In her declaration and supplemental report, Rosevear does not explicitly state that she considered only "clean" claims. She refers only to "claims." ECF Nos. 104-2 at 3-4; 104-3 at 11-13; *id.* at 18 (stating she first "identified claims paid more than 60 days late"). Even if she had asserted that she considered only clean claims, she does not explain how she determined from THT's data what claims were "clean."

I do not consider Rosevear's Reply Report attached to the plaintiffs' opposition to THT's motion to strike because it is untimely. ECF No. 112-2. That report is dated July 9, 2025. *Id.* at 2. Expert disclosures were due November 18, 2024, rebuttal expert disclosures were due December 18, 2024, and discovery closed April 17, 2025. ECF Nos. 96 at 4; 99 at 7. The Reply Report was prepared after the defendants had already moved for summary judgment and moved to strike Rosevear as an expert. ECF Nos. 107; 108. The plaintiffs offer no explanation for this

1  untimely disclosure.  But even if I considered the Reply Report, Rosevear again does not state

2  that she considered only clean claims.  Instead, she states she relied on "THT's own data" where

3  claims "were reimbursed to members more than 60 days after the date of service." ECF No. 112-

4  2 at 28.  Taking that statement at face value, Rosevear apparently included any claim over 60

5  days as late and a breach by THT regardless of the actual reason for the delayed payment.  I thus

6  have no evidentiary basis to conclude that Rosevear considered only clean claims.

7        Further, Rosevear's model cannot identify injury or damages on a class-wide basis, so

8  individualized inquiries will predominate.  Rosevear states that the plaintiffs' counsel asked her

9  to calculate damages "assuming that members covered the outstanding expenses from the 60th

10 day through the date THT paid the bill." ECF No. 104-3 at 16; *id.* at 18 ("Counsel for Plaintiffs

11 asked me to assume that if a claim was not paid within 60 days, the patient paid the bill, covering

12 the cost of the bill until the insurance company made the payment.").  Rosevear used two models

13 to project damages using different interest rates, where each model assumes every claim over 60

14 days was late and every participant with a late claim paid on the 60th day. *Id.* at 18-19.  But there

15 is no factual basis for these assumptions.  The plaintiffs have not presented evidence of a single

16 plaintiff who paid a bill on the 60th day.[4]  Nor have the plaintiffs shown that the date when a

17 particular class member paid a provider or was sent to collections by an unpaid service provider

18 can be derived from THT's claims data.  Thus, individualized inquiries will be needed to

19 determine if a class member was injured by the late payment by, for example, paying the bill

20 themselves or being sent to collections.  Rosevear's model does not fill the gap because it

21

---

22 [4] The plaintiffs have presented one bill that plaintiff Annette Anas paid. ECF No. 104-5 at 2.
   According to Anas, the date of service was March 7, 2015, and she paid the balance due to the
23 provider on November 6, 2015. ECF No. 104-4 at 3.  It is unclear from Anas's declaration when
   the claim was submitted to THT.  THT later paid the bill, triggering a $687 refund to Anas in
   January 2019. *Id.*

presumes harm even if members did not pay the bill or were not entitled to payment under the plan due to subrogation, coordination of benefits, or missing information. And the plaintiffs have not identified any class-wide means to determine which class members paid the bill on their own, when they did so, or what interest rate should apply until THT paid. *See* ECF No. 107-3 at 8-9 (Rosevear testifying that she was "not asked to evaluate" any information "to determine whether the patient had paid [a] bill").

The "need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016). But the "plaintiffs must show that damages are capable of measurement on a classwide basis, in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *Owino v. CoreCivic, Inc.*, 60 F.4th 437, 447 (9th Cir. 2022) (simplified). "In other words, plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Id.* (simplified); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and "must measure only those damages attributable to" the plaintiffs' theory of liability). Rosevear's model does not accomplish that result. This is not a situation where the individualized damages inquiries will simply become a matter of math once liability is established. *Cf. Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (holding that individualized damages did not preclude class certification where the employer's "computerized payroll and time-keeping database would enable the court to accurately calculate damages and related penalties for each claim"). Rather, class members will have to present evidence that varies from member to

17

member based on individualized proof to show breach, injury, and resulting damages.

Decertification is therefore appropriate for this aspect of the plaintiffs' breach of contract claim.

**IV.  MOTION FOR SUMMARY JUDGMENT**

**A.  The plaintiffs' claim that THT breached the contract through its cost-sharing with members or by reducing in-network benefits fails as a matter of law on a class-wide basis because the plan documents state that the plan can change at any time and because THT is not responsible for changes that are collectively bargained between CCSD and CCEA.**

THT argues that the plaintiffs' breach of contract claim based on changes to benefit levels, premium amounts, and other cost-sharing mechanisms cannot support a claim because benefits are not vested unless the plan specifically says so and THT's plan does not.  Rather, THT asserts, health plans generally can change coverage and other terms, and THT's plan specifically stated that benefits could change.  Relatedly, THT contends that it is not responsible for any damages related to the health plan's design or premium amounts because the CBA between CCSD and CCEA makes the plan's substantive benefit terms, and changes to those terms are subjects of mandatory bargaining over which THT has no control.

The plaintiffs respond that CCSD adequately funded the health plan, but THT breached its contract with plan participants by failing to timely pay providers, which led to THT failing to maintain adequate in-network service providers who left the network due to late payments.  According to the plaintiffs, that in turn led to raised costs for participants who had to pay more for out-of-network services.  The plaintiffs rely on Rosevear's damages model related to increases in out-of-network use and cost-sharing to assert that they can reliably estimate the harm to class members based on common evidence and methodology.  As for the fact that the

18

premium amounts and benefit levels are negotiated between CCSD and CCEA, the plaintiffs argue that their breach of contract claim is only against THT, who is the party who made contractual promises through the plan documents.  They assert that their damages "do not stem from substantive benefit changes that must be negotiated by the bargaining parties; but rather from breaches of the Plan Documents [that] set forth the substantive benefits that had already been negotiated." ECF No. 114 at 19.

THT's plan documents stated that although THT expected the benefits "to be an ongoing program," it "reserve[d] the right to change, suspend or discontinue all or any part of the plan at any time," and that the health benefits were "not a vested right but may be changed, reduced or modified at the discretion of the Board of Trustees." ECF No. 108-15 at 12.[5]  This unambiguous language provides that changes in premiums, deductibles, co-pays, co-insurance, out-of-pocket maximums, and network of providers do not constitute breaches of the plan contract because the contract specifically allowed for changes.

The plaintiffs have not pointed to any contract term THT breached by reducing in-network benefits or increasing cost-sharing with members in the form of increased premiums, deductibles, co-payments, co-insurance rates, or out-of-pocket maximums.  The contract terms the plaintiffs point to are mere aspirational statements that do not promise that the plaintiffs would not experience increased costs or changes in providers.[6]  These vague, general,

---

[5] The plan language was not exactly the same throughout the class period, but the plan consistently stated that THT reserved the right to amend, modify, or discontinue all or any part of the plan at any time. *See* ECF Nos. 108-15 at 18-19, 34, 48-49, 68-70, 85-86, 115, 124, 142, 152, 154, 166, 185, 189, 205, 219, 246, 249, 263-64, 292-93, 341-42, 388-89; 119-15 at 9.

[6] The plaintiffs point to the following statements in the plan documents as the provisions THT allegedly breached:

    a. The mission of the Teachers Heath Trust is to achieve proven excellence in delivering the highest quality of health and welfare benefits for our Participants.

aspirational statements do not overcome the plain, unambiguous language that the plan could be modified at any time. Nor do the plan documents promise the plaintiffs they would have a plan substantially similar to the one they had in 2014. *See* ECF No. 104-3 at 8 (the plaintiffs' expert using 2014's plan as a "benchmark" to calculate damages for subsequent years under which the plaintiffs were less well off); 114 at 18 (the plaintiffs' response brief relying on Rosevear's calculations comparing THT's "newer healthcare plans in comparison to a benchmark, specifically, THT's healthcare plan available in 2014," and stating that the "model assumes that had employees been given a plan similar to the one available to them in 2014, they would have been financially better off").

The plaintiffs point to *Michael v. Riverside Cement Co. Pension Plan* to argue that a reduction in promised benefits can give rise to a breach in providing defined benefits. 266 F.3d 1023 (9th Cir. 2001). But a "crucial point" in *Michael* was that the relevant plan provided that a retired employee's reemployment with the company "did not otherwise impair the early retirement benefits [the employee] had received." *Id.* at 1025. In other words, the benefits there

---

b. The Trust provides you with:

• Freedom of choice–There are many Providers from a variety of specialties to choose from to treat your health care needs.

• Access to Emergency health care when and where it is needed.

• Services designed to encourage early health care intervention.

c. The Teachers Health Trust also:

• Provides financial security to you and your Dependents by keeping health care costs low.

• Promotes full participation by all Participants as partners.

• Treats all Participants with respect.

• Allows you access to all information concerning yourself and the Trust.

ECF No. 114 at 6-8, 17-18.

1  were vested, so a change to those benefits was a breach. *See id.* at 1028 (stating that the plan

2  "impermissibly reduced [the employee's] accrued benefits in violation of" ERISA's anti-cutback

3  rule[7]). Here, the THT benefits are not vested, so *Michael* is inapplicable.

4        Additionally, the plaintiffs have not raised genuine disputes about various categories of

5  claimed damages.  As to premiums, THT has presented evidence that during the entire class

6  period, it "had no ability whatsoever to [set] the premiums charged to THT health plan

7  participants" because the "amount of premium paid by THT participants was only set through

8  collective bargaining between CCSD and CCEA." ECF No. 108-1 at 3.  The CBA requires

9  CCSD and CCEA to "negotiate with the other regarding any proposed substantive benefit

10 changes (including without limitation increased participant contributions, reductions in benefits

11 or increase in benefits)." ECF No. 108-13 at 3.  The plaintiffs have presented no contrary

12 evidence.  Accordingly, the plaintiffs' claims related to changes in benefits and contributions fail

13 because there is no evidence that THT had control over what CCSD and CCEA negotiated on

14 those points.

15       Similarly, THT has presented evidence that THT does not collect co-pays from members,

16 rather the healthcare providers do. ECF No. 108-1 at 3.  The plaintiffs do not point to evidence

17 that if they were overcharged on co-pays, it was because THT collected excessive co-pays or told

18 the providers to do so.

19

---

20 [7] *Michael* arose under ERISA, which, as discussed above, does not apply to THT.  Nevertheless, *Michael*'s holding refers to vested benefits under ERISA.  As the *Michael* court stated,

21 "Congress' purpose in enacting ERISA was to ensure that if a worker has been promised a defined benefit upon retirement-and if he has fulfilled whatever conditions are required to obtain a vested benefit he actually receives it." 266 F.3d at 1026 (simplified).  "One of the outer bounds

22 on an employer's accrual practices under ERISA is the prohibition against decreasing accrued benefits by plan amendment, known as the 'anti-cutback rule'" in 29 U.S.C. § 1054(g). *Id.*  The

23 anti-cutback rule prohibits plan amendments from decreasing an "accrued benefit." 29 U.S.C. § 1054(g).  The rule does not prohibit plan amendments for non-vested, non-accrued benefits.

In sum, I grant summary judgment in THT's favor on a class-wide basis on the portion of the breach of contract claim related to changes in benefits, providers, and cost-sharing.

**B. I grant summary judgment on the individual plaintiffs' claim based on THT's late payment of benefits, except for named plaintiff Anas.**

THT asserts that no plaintiff was injured by late payments because all outstanding claims have been paid. Additionally, THT notes that at their depositions, Paula Kevish, Sheri Tapani-DeBartolo, Michelle Reilly, and Diana Goodsell could not identify anything they were owed. THT concedes that Annette Anas has presented evidence that she went four years without being paid for a hospital bill. It contends that it was not solely responsible for the delay because THT paid the bill in November 2017, and the hospital did not reimburse Anas until 2019 when she called to inquire about it. THT argues that Anas was not sent to collections or denied treatment based on any late payments. THT also argues that the plaintiffs were required to exhaust the plan's administrative remedies, but none appealed any adverse benefit decision.

The plaintiffs respond by relying on Rosevear's supplemental expert report to show damages. They also contend that they did not have to appeal because there was no "Adverse Benefit Determination" to appeal, as these were claims that were not denied, just paid late. The plaintiffs also argue that ERISA's general requirement that a claimant exhaust administrative remedies does not apply to THT because ERISA does not apply to benefit plans for government employees.

The plaintiffs do not point to any evidence that named plaintiffs Goodsell, DeBartolo, Reilly, or Kevish paid a claim that THT should have paid, or any evidence of their resulting damages. Rosevear's report does not fill the gap because, as discussed above, she assumes that every class member paid a bill on the 61st day. She does not state that she relied on data

1  showing any of these named plaintiffs paid a bill because THT failed to timely pay.  I therefore

2  grant THT's motion for summary judgment as to them.

3       There is evidence that Anas paid one hospital bill by credit card that THT paid two years

4  later and that Anas suffered damages from carrying costs. ECF Nos. 104-2 at 5-6[8]; 104-5; 119-4

5  at 14-15, 17-18.  She testified that she filled out the required form and THT did not ask her for

6  any additional information. ECF No. 119-4 at 20.  But she had to pay the bill in November 2015,

7  or else she would be sent to collections. *Id.* at 22.  According to Anas, THT kept assuring her it

8  was going to pay. *Id.* at 22-23.  THT ultimately made a payment to the hospital in November

9  2017. *Id.* at 22-23.  Anas later learned that THT would not directly reimburse her, and she would

10 instead have to obtain reimbursement from the hospital. *Id.* at 23.  She ultimately received that

11 reimbursement from the hospital in 2019. *Id.*  Anas did not know why the hospital delayed

12 paying her until 2019 when THT had paid the hospital in 2017. *Id.* at 24.  But she asserts that

13 THT never told her that it had paid the hospital. *Id.* at 23-24.  Based on this evidence, a

14 reasonable jury could find that THT breached the contract because Anas presented her claim to

15 THT, THT should have timely paid it but did not so Anas paid it, and THT failed to pay the

16 claim for years, resulting in her suffering damages from carrying the costs.[9]

17

18

---

19 [8] Rosevear states that she used Anas's actual billing record to determine damages. ECF No. 104-2 at 4-5.

20 [9] THT asserts it did not breach because the payment was delayed due to "third-party liability
(subrogation) provisions."  But THT presents no evidence to show that is the reason why THT
21 took two years to pay the hospital. ECF No. 108 at 13, 18-19.  Although THT points to Anas's
testimony about having to fill out forms related to subrogation, THT does not identify where
22 Anas stated that it took her two years to do so.  Nor does it point to any other evidence that it
took THT, the hospital, and any other third party two years to resolve a subrogation issue.  THT
23 therefore has not met its burden to show no genuine dispute remains regarding a breach related to
the 2015 hospital bill.

THT argues, however, that Anas (and all plaintiffs) had to exhaust administrative remedies by appealing, and Anas did not do so.  There is no dispute that Anas's claim related to the unpaid bill occurred under the 2015 plan.  Under that plan, THT was required to mail a determination of coverage, otherwise known as an Explanation of Benefits (EOB) to the participant. ECF No. 119-11 at 16.  If THT required additional information before it could process the claim, the plan stated that THT would send a written letter to the participant and the medical services provider to explain "what is needed." *Id.*  Under the plan, if THT denied a claim "in whole or in part, and/or [the participant] disagree[d] with the benefit determination, [the participant had] the right to appeal the benefit denial." *Id.*  The plan provided that an appeal must be commenced "within six months of receiving the Explanation of Benefits explaining the reason for the denial or a notice of non-coverage or reduced benefits by the Trust," or for "processed" claims or any "eligibility determination," within "180 days following receipt of the Trust's Explanation of Benefits or eligibility determination." *Id.*

THT's trust formation agreement directs THT's trustees to adopt a written benefit plan that "shall, among things," include "a claims procedure in conformity with ERISA section 503." ECF No. 8-3 at 18.  Section 503 of ERISA, 29 U.S.C. § 1133, provides that

> every employee benefit plan shall . . . provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

Although ERISA requires the plan to have appeal procedures, it does not, in and of itself, require a participant or beneficiary to exhaust administrative remedies to bring a claim. *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008).  However, "federal

1  courts have universally construed § 1133 to require exhaustion." *Brown v. J.B. Hunt Transp.*

2  *Servs., Inc.*, 586 F.3d 1079, 1084 (8th Cir. 2009). Thus, "an ERISA plaintiff claiming a denial of

3  benefits must avail himself or herself of a plan's own internal review procedures before bringing

4  suit in federal court." *Vaught*, 546 F.3d at 626 (quotation omitted). There are exceptions to this

5  "prudential exhaustion requirement." *Id.* For example, a participant need not exhaust when it

6  would be futile, the remedy is inadequate, or the plan fails to establish or follow reasonable

7  claims procedures. *Id.*

8       Although ERISA does not specifically apply to THT, the trust formation documents

9  indicate THT was intended to conform with ERISA, including a specific reference to the trustees

10 creating a claims procedure that conforms to ERISA, so ERISA's exhaustion caselaw applies to

11 THT's plan and its participants. But THT has not met its initial burden on summary judgment to

12 show Anas had to appeal under the 2015 plan terms and that any failure to comply with a

13 required appeal was unexcused.

14      THT has not pointed to evidence that it sent Anas an EOB, which the plan required it to

15 do both generally and as the trigger for the deadline to appeal. "When an ERISA-governed plan

16 fails to comply with its antecedent duty under § 1133 to provide participants with notice and

17 review, aggrieved participants are not required to exhaust their administrative remedies before

18 filing a lawsuit for benefits . . . ." *Brown*, 586 F.3d at 1085.[10] Additionally, THT has not

19 adequately addressed whether Anas was required to exhaust when the 2015 plan states only that

20 a participant has a "right" to, is "entitled to," or "may" appeal, not that she must do so. *See* ECF

21 No. 119-11 at 16; *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770

22

---

23 [10] Neither party has addressed whether the proper remedy is to "remand to the plan administrator for an out-of-time administrative appeal" if THT did not timely send Anas an EOB. *Counts v. Am. Gen. Life & Acc. Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997).

F.3d 1282, 1299 (9th Cir. 2014) (stating that "a claimant need not exhaust when the plan does not require it"). Indeed, the section of THT's motion that advocates for exhaustion discusses the "plan documents from 2016 to now," not the 2015 plan. ECF No. 108 at 16. And THT's motion elsewhere acknowledges that in August 2016, THT "updated its plan document to add that the appeals process outlined above must be completed prior to initiating legal action regarding a claim for benefits." *Id.* at 7 (simplified). THT implicitly acknowledged that prior to August 2016, the plan documents did not mandate exhaustion. THT therefore has not met its initial burden on summary judgment, so I deny its motion as to named plaintiff Anas regarding the 2015 hospital bill.

### C. There is no claim in this case for a breach of contract for failure to preserve member information.

In the plaintiffs' opposition to THT's motion for summary judgment, they argue THT breached the plan document that states THT "[a]llows [the participant] access to all information concerning yourself and the Trust." ECF No. 114 at 6. The plaintiffs suggest THT breached this contractual term because THT did not preserve the 2012-2015 plan members' information. In reply, THT argues that there is no claim in the second amended complaint related to a lack of access to patient information, nor is there any evidence to support a claim now.

The second amended class action complaint does not allege a breach of contract claim based on THT's failure to preserve member information. *See* ECF No. 1-2. The plaintiffs cannot raise a new theory of contractual liability in response to a summary judgment motion. *Terpin v. AT&T Mobility LLC*, 118 F.4th 1102, 1113 (9th Cir. 2024). It is unclear when the plaintiffs learned of the data loss, but the plaintiffs knew as of December 2024 that THT had not produced any data from before January 1, 2016. *See* ECF No. 104-11 at 4. The plaintiffs could have

moved to amend to assert a breach of contract claim based on a failure to preserve evidence but did not.  Thus, there is no such breach of contract claim in this case.

### D.  I deny THT's motion to strike Rosevear as moot.

I deny THT's motion to strike Rosevear's expert testimony as moot because even considering her report, no genuine disputes remain, except with respect to Anas.  The evidence that supports Anas's claim is not limited to Rosevear's report, and THT does not specifically attack Rosevear's report to the extent it relied on Anas's actual billing records.

### E.  I grant in part the plaintiffs' spoliation motion.

The plaintiffs move for an adverse inference against THT for spoliation under Federal Rule of Civil Procedure 37(e).  The plaintiffs argue that THT failed to preserve claims data prior to January 1, 2016 despite being on notice of a duty to preserve when the plaintiffs filed suit on May 11, 2018 and sent a litigation hold letter on October 8, 2018.  They seek sanctions of an adverse inference regarding that data and acceptance of Rosevears' damages extrapolation model for the 2012-2015 class period.

THT responds that it was not on notice that pre-2016 claims data was relevant to this case until March 2022, when the plaintiffs first moved the state court to extend the class period back to May 12, 2012.  THT asserts that earlier iterations of the complaint limited the alleged misconduct to beginning after January 1, 2016, so it had no notice that claims data prior to that date was relevant to the litigation.  THT asserts that it was not until July 10, 2023 that the plaintiffs first included allegations in the second amended complaint of a class period beginning in 2012.  THT thus argues it did not have an obligation to maintain the earlier claims data, and that it did not delete claims data in bad faith, so it should not be sanctioned.

To the extent the plaintiffs seek a spoliation ruling to support expert Rosevear's report in which she extrapolated damages for the proposed 2012-2015 class period, I have already explained why the plaintiffs' claims fail on a class-wide basis for any class period. Either the class has no claim for changes to the plan, or Rosevear's model cannot show class-wide injury or damages for late payments. Further, the plaintiffs have not pointed to evidence that any named plaintiff suffered harm in the 2012-2015 period except Anas. They do not argue that but for the data loss, a named plaintiff could have established a breach and damages without resorting to Rosevear's model.

But as discussed above, Anas has raised genuine disputes about at least one unpaid bill. And there is evidence she may have had more than the one unpaid bill from the 2015 time period. *See, e.g.*, ECF No. 119-4 at 10-14. So I address whether THT spoliated the 2012-2015 claims data and, if so, what is the appropriate remedy.

A party spoliates evidence "only if [it] had some notice that the documents were potentially relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (quotation omitted). "The duty to preserve arises not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." *In re Nat'l Consumer Mortg., LLC*, No. 2:10-cv-00930-PMP-PAL, 2011 WL 1300540, at *8 (D. Nev. Mar. 31, 2011). Thus, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents" or other evidence. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). However, a "party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its

28

policy or in the normal course of its business." *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009). The party seeking sanctions bears the burden of establishing spoliation by showing that the spoliating party (1) destroyed evidence and (2) had notice that the evidence was potentially relevant to the litigation before it destroyed the evidence. *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015).

THT electronically stored its claims data, so I refer to Federal Rule of Civil Procedure 37(e) to determine whether sanctions are warranted and, if so, what sanctions, if any, are appropriate. Rule 37(e) provides that

> [i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

There is no dispute THT destroyed evidence, either because it lost it or intentionally deleted it. The plaintiffs have met their burden to show THT had notice the evidence was potentially relevant to the litigation before THT destroyed or lost it. The plaintiffs filed the initial complaint in this action on May 11, 2018 and sent a preservation letter to THT requesting a litigation hold for all electronically stored information from 2008 to the present. ECF Nos. 111-1 at 2; 106-2 at 2. The original complaint alleged misconduct related to the January 1, 2016 change in health insurance administrator to Wellhealth. ECF No. 111-1 at 10. As part of those allegations, the plaintiffs alleged that the new 2016 plan would be worse than what they

previously had, including that "for the first time they would be required to pay premiums" for their health insurance. *Id.* at 4.  Thus, THT knew or should have known that pre-2016 data would be relevant to the plaintiffs' claim that plan terms changed for the worse.  Thus, the plaintiffs have met their burden to show THT should have preserved the 2012-2015 claims data but failed to do so.  THT has no explanation for the failure, so there is no evidence it took reasonable steps to preserve the data.  And there is no dispute that the data cannot be obtained through other discovery.  THT's director of healthcare delivery, Jaronimo Wright, avers that he is "aware of no third parties or other sources where such claims data would be stored." ECF No. 111-6 at 3.

However, the plaintiffs have not presented a sufficient basis to impose the harsh sanctions they seek.  They seek an adverse inference, but I may impose that sanction "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).  There is little evidence as to when or why THT deleted or lost the data.  Wright states that in his current role, and in another role he held from January 2022 through March 2023, he "was responsible for overseeing and working with databases belonging to THT," including the claims data. ECF No. 111-6 at 2-3.  He responded to the plaintiffs' discovery requests for claims data and "[a]fter an exhaustive search for any claims data prior to January 1, 2016, [he] was unable to locate such claims data." *Id.* at 3.  Wright states that he did not delete the data nor direct anyone to do so, and to his knowledge, no THT employee did so. *Id.* at 3-4.

The plaintiffs provide no evidence of THT's intent and simply state in conclusory fashion that "the loss of the electronic information was done with the intent to deprive Plaintiffs and the Class of the information at trial." ECF No. 106 at 7.  I see no basis to draw that conclusion given that THT produced claims data from 2016 onward, and January 1, 2016 is when the plaintiffs

1   alleged their benefits worsened.  If THT were trying to hide the ball, it surely would have done

2   so during the time of the alleged misconduct as identified in the original and first amended

3   complaints, not before.  For the same reasons, I find no bad faith to support what would amount

4   to a claim-dispositive ruling that Rosevear's model of damages must be accepted for the 2012-

5   2015 time period as the plaintiffs request.

6        That leaves the question of what sanction, if any, to impose.  Under Rule 37(e)(1), "upon

7   finding prejudice to another party from loss of the information, [I] may order measures no

8   greater than necessary to cure the prejudice."  But it is unclear what that might be in the context

9   of this now narrowed-down case.  Anas may be prejudiced because she was a plan participant

10  during the years for which there is no data.  So if she could have pointed to other bills that THT

11  paid late, but cannot because THT spoliated claims data, then she may have been prejudiced by

12  not being able to present anything more than just the one bill.  But because the parties focused

13  their briefing on the class claims rather than the individually named plaintiffs' claims, they have

14  not addressed what might be a proper sanction in relation to Anas.

15        Accordingly, I grant the plaintiffs' motion for spoliation sanctions in part.  THT has lost

16  evidence it knew or should have known to maintain, it failed to take reasonable steps to preserve

17  the data, and the data cannot be restored or replaced through additional discovery.  The only

18  question that remains is the proper sanction.  I therefore direct the parties to confer on this issue.

19  If they reach an agreement, they can file a stipulation.  If they cannot, then the plaintiffs must file

20  a new motion for spoliation sanctions that addresses the proper sanction related to Anas that is

21  consistent with this order.

22  / / / /

23  / / / /

## V.  CONCLUSION

I THEREFORE ORDER that the plaintiffs' motion to amend certified class definition **(ECF No. 104) is GRANTED in part**.

I FURTHER ORDER that the plaintiffs' motion for spoliation sanctions **(ECF No. 106) is GRANTED in part**.

I FURTHER ORDER that defendant Teachers Health Trust's motion to strike **(ECF No. 107) is DENIED as moot**.

I FURTHER ORDER that defendant Teachers Health Trust's motion for summary judgment **(ECF No. 108) is GRANTED in part**.  I grant summary judgment in Teachers Health Trust's favor on (1) the class claims related to an alleged breach of contract based on changed plan terms and (2) the individual claims of named plaintiffs Diana Goodsell, Sheri DeBartolo, Michelle Reilly, and Paula Kevish related to an alleged breach of contract based on late payments.  I deny summary judgment on (1) the class claims related to an alleged breach of contract based on late payments because I decertify the class on this claim, and (2) the individual claim of named plaintiff Annette Anas related to one bill in 2015.

I FURTHER ORDER the parties to confer about an appropriate sanction related to Teachers Health Trust's spoliation of the 2012-2015 claims data in relation to Annette Anas.  If the parties can agree, they must file a stipulation setting forth their agreement by April 6, 2026.  If they cannot agree, then the plaintiffs must file a new motion for spoliation sanctions by April 6, 2026.

I FURTHER ORDER that by April 6, 2026, the plaintiffs must file a status report indicating whether they intend to proceed against defaulted defendants Medsource Management

Group, LLC and Value Based Healthcare Institute, LLC, and if so, what they intend to do, including a proposed schedule.

I FURTHER ORDER that the proposed joint pretrial order is due 30 days after I either grant the parties' stipulation related to spoliation or rule on the plaintiffs' new motion for spoliation.

DATED this 8th day of March, 2026.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE